[No. A093081. First Dist., Div. Two. Oct. 18, 2001.]

TRAVELERS CASUALTY AND SURETY COMPANY, Plaintiff and Respondent, v.
AMERICAN EQUITY INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

Kenneth D. Simoncini for Defendant and Appellant.

Dwain W. Bird & Associates and Trygve L. Stromberg for Plaintiff and Respondent.

**OPINION**

**KLINE, P. J.—**

## I. INTRODUCTION

Defendant American Equity Insurance Company (American Equity) appeals from a judgment of the Alameda County Superior Court following the

grant of summary judgment in favor of plaintiff Travelers Casualty and Surety Company (Travelers) on Travelers' complaint for indemnity and contribution against American Equity. The trial court concluded that the doctrine of equitable contribution, rather than subrogation, applied, and that Travelers was entitled therefore to recover from American Equity 50 percent of the costs it had expended in defense and indemnification of the parties' common insured, Preferred Capital Management, Inc. (Preferred Capital).

## II. BACKGROUND

### A. *Court Order and Property Management Agreement*

Preferred Capital managed Lakeview Tower Apartments (Lakeview) in Oakland under a property management agreement between Preferred Capital and M.A. Hoopes, the receiver appointed by the court in connection with a foreclosure action on Lakeview.

The court order appointing the receiver authorized her to manage the property or to retain a property manager and also provided in relevant part: "If sufficient insurance coverage [for the property] does exist, defendants shall be responsible and are hereby ordered to make certain that the Receiver is named as an additional insured on such policy for the entire period that the Receiver shall be in possession of the subject property."

The receiver retained Preferred Capital to act as property manager for Lakeview. The property management agreement between the receiver and Preferred Capital required the receiver to obtain insurance coverage for the property and to name Preferred Capital as an additional insured. It also contained a general indemnity clause providing that the receiver would fully indemnify Preferred Capital for and against any and all claims arising out of the property management agreement.

Specifically, paragraph 4.05 provided:

"4.05 Insurance Coverage. Receiver shall procure and maintain, throughout the Term, insurance coverage with respect to the Project in amounts and issued by companies approved by Receiver. All cost of insurance will be at the expense of the Project and will name Manager as additional insured. . . ."

Paragraph 9.01 of the property management agreement provided in relevant part:

"9.01 Indemnification of Manager. Receiver agrees as follows:

"(a) To hold and save Property Manager free and harmless from all expenses, claims, liabilities, losses, judgments or damages, including reasonable attorneys fees, which Manager may suffer or incur as a result of injury, loss or damage to person or property by reason of any cause whatsoever either in or about the Project or elsewhere, when property manager is carrying out the provisions of this Agreement, or acting under the express or implied directions of the owner."

B. *Insurance Policies*

Alonzo Henry, a tenant at Lakeview, sued Preferred Capital for damages he sustained when he jumped out of his bedroom window to avoid an intruder. At the time of Henry's loss, Preferred Capital was the named insured of a commercial general liability policy issued by American Equity. It was also insured under a Travelers' general commercial liability policy identifying Lakeview (identified in the policy as a partnership) as the named insured, and providing coverage for real estate managers of the named insured. Both insurance policies contained virtually identical provisions regarding "other insurance."[1] Each policy stated it was primary, except that it was excess over other valid and collectible insurance.

C. *Settlement and Summary Judgment*

The lawsuit was tendered for defense and indemnity to both Travelers and American Equity. Travelers accepted the tender without a reservation of

---

[1]Both insurance policies contained the following "other insurance" provision:
"4. **Other Insurance.**
"If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage [Part/Form], our obligations are limited as follows:
"a. Primary Insurance
"This insurance is primary except when b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.
"b. Excess Insurance
"This insurance is excess over any of the other insurance, whether primary, excess, contingent or on any other basis: (1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for 'your work'; [¶] . . . [¶]
"When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or 'suit' that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. . . . [¶] . . . [¶]
"c. Method of Sharing
"If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first. . . ."

rights and assumed the defense of Preferred Capital. American Equity refused to participate in the defense of the action. Travelers settled the underlying lawsuit on behalf of Preferred Capital for $31,000 and thereafter initiated the present action against American Equity, seeking pro rata equitable contribution for one-half of the costs and fees expended in the defense and settlement of Alonzo Henry's action.

Both Travelers and American Equity moved for summary judgment. The parties stipulated that both policies covered the liability loss; that Travelers defended and indemnified Preferred Capital, while American Equity did not; that "other insurance" provisions in both policies were applicable. On August 14, 2000, the trial court entered its order granting summary judgment to Travelers and denying summary judgment to American Equity. The court found that both policies provided primary coverage and that they contained "substantially identical 'other insurance' clauses." The court concluded that both policies provided coverage at the same level. Therefore, in accordance with the general rule of policy interpretation, conflicting "other insurance" clauses would be ignored and Travelers was entitled to contribution from American Equity on a pro rata basis. The court also concluded that American Equity "demonstrated no equitable considerations that take the subject setting outside the general rule." The court ordered American Equity to pay Travelers $19,638.77 (half the $39,277.54 expended by Travelers in the underlying suit).

American Equity appeals, arguing that by virtue of the indemnity provision of the property management agreement between the receiver and Preferred Capital, its coverage is "excess" to Travelers' primary coverage.

### III. Discussion

#### A. *Standard of Review*

"Summary judgment is granted when the moving party establishes that there are no triable issues of any material fact. A summary judgment motion is directed to the issues framed by the pleadings. (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673 [25 Cal.Rptr.2d 137, 863 P.2d 207]; [citations].)" (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1073 [85 Cal.Rptr.2d 627] (hereafter *Reliance*).) The moving party must establish he or she is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) We review de novo the trial court's decision granting summary judgment (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 487 [59 Cal.Rptr.2d

20, 926 P.2d 1114]) and we review the trial court's ruling, not its stated reasons. (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356]; *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805 [85 Cal.Rptr.2d 459]; accord, *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67 [105 Cal.Rptr.2d 652].)

B. *Insurance Law*

■ "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.)" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

(1) *The two levels of insurance*

■ There are two levels of insurance coverage, primary and excess. (E.g., *Reliance, supra,* 72 Cal.App.4th at p. 1076.) "Primary coverage is insurance coverage whereby, under the terms of the policy, liability attaches immediately upon the happening of the occurrence that gives rise to liability. . . . [¶] 'Excess' or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted." (*Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 597-598 [178 Cal.Rptr. 908], italics omitted; *Reliance, supra,* 72 Cal.App.4th at p. 1076.) "It is settled under California law that an excess or secondary policy does not cover a loss, nor does any duty to defend the insured arise, until *all* of the primary insurance has been exhausted." (*Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329, 339 [57 Cal.Rptr.2d 755]; accord, *Reliance, supra,* 72 Cal.App.4th at p. 1077.)

(2) *Other insurance clauses*

"Most insurance policies contain 'other insurance' clauses that attempt to limit the insurer's liability to the extent that other insurance covers the same risk. Such clauses attempt to control the manner in which each insurer contributes to or shares a covered loss. [Citations.]" (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2000) ¶ 8:10, p. 8-2.) "The courts will . . . generally honor the language of excess 'other insurance' clauses when no prejudice to the interests of the insured will ensue. However, there are many exceptions. For example, where two or

more primary insurers' policies contain excess 'other insurance' clauses purporting to be excess to each other, the conflicting clauses will be ignored and the loss prorated among the insurers on the ground the insured would otherwise be deprived of protection. (*Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co., supra,* 126 Cal.App.3d at p. 599; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 8:32-8:33, pp. [8-10 to 8-11].) Thus, although a true excess insurer—one that is solely and explicitly an excess insurer providing only secondary coverage—has no duty to defend or indemnify until all the underlying primary coverage is exhausted or otherwise not on the risk, *primary* insurers with conflicting excess 'other insurance' clauses *can* have immediate defense obligations. [Citations.]" (*Fireman's Fund Ins. Co.* v. *Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1304-1305 [77 Cal.Rptr.2d 296].)

" 'Other insurance' clauses become relevant only where several insurers insure the same risk at the *same level* of coverage. An 'other insurance' dispute cannot arise between excess and primary insurers. [Citations.]" (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* at ¶ 8:12, p. 8-3, citing, among others, *Olympic Ins. Co.* v. *Employers Surplus Lines Ins. Co., supra,* 126 Cal.App.3d at p. 598, and *Fireman's Fund Ins. Co.* v. *Maryland Casualty Co., supra,* 65 Cal.App.4th at p. 1304; see also *Reliance, supra,* 72 Cal.App.4th at p. 1077.)

(3) *Subrogation and contribution*

"The Court of Appeal in *Fireman's Fund Ins. Co.* v. *Maryland Casualty Co., supra,* 65 Cal.App.4th at pages 1291-1292, explained the concepts and confusion surrounding the theories of subrogation and contribution at length as follows: 'As one California appellate court has opined, "[i]t is hard to imagine another set of legal terms with more soporific effect than indemnity, subrogation, contribution, co-obligation and joint tortfeasorship." [Citation.] It is also difficult to think of two legal concepts that have caused more confusion and headache for both courts and litigants than have contribution and subrogation. [Citation.] Although the concepts of contribution and subrogation are both equitable in nature, they are nevertheless distinct. [Citations.] [¶] Subrogation is defined as the substitution of another person in place of the creditor or claimant to whose rights he or she succeeds in relation to the debt or claim. By undertaking to indemnify or pay the principal debtor's obligation to the creditor or claimant, the "subrogee" is equitably *subrogated* to the claimant (or "subrogor"), and succeeds the subrogor's rights against the obligor. [Citation.] In the case of insurance, subrogation takes the form of an insurer's right to be put in the position of

the insured in order to pursue recovery from third parties legally responsible to the insured for a loss which the insurer has both insured and paid. [Citations.] " 'As now applied [the doctrine of equitable subrogation] is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.' [Citations.]" [Citation.] [¶] . . . [¶] The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to " 'stand in the shoes' " of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have. [Citations.]' (Fn. omitted, original italics.)" (*Reliance, supra,* 72 Cal.App.4th at pp. 1077-1078.)

■ "The Court of Appeal continued: 'Equitable contribution is entirely different. It is the right to recover, not from the party *primarily* liable for the loss, but from a *co-obligor who shares* such liability with the party seeking contribution. In the insurance context, the right to contribution arises when several insurers are obligated to indemnify [or] defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others. Where multiple insurance carriers insure the same insured and cover the same risk, each insurer has independent standing to assert a cause of action against its coinsurers for equitable contribution when it has undertaken the defense or indemnification of the common insured. Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk. The purpose of this rule of equity is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. [Citations.]' (*Id.* at pp. 1293-1294, fn. omitted, original italics.) As a general rule, there is no contribution between a primary and an excess carrier. (*Id.* at p. 1294, fn. 4; [citations].) However, where different insurance carriers cover differing risks and liabilities, they may proceed against each other for reimbursement by subrogation rather than by contribution. [Citations.]" (*Reliance, supra,* 72 Cal.App.4th at pp. 1078-1079.)

In short, "[e]quitable subrogation allows an insurer that paid coverage or defense costs to be placed in the insured's position to pursue a full recovery

from another insurer who was primarily responsible for the loss. [Citation.] . . . This doctrine commonly applies to shift defense costs between primary and excess insurers. [Citations.]" (*Maryland Casualty Co. v. Nationwide Mutual Ins. Co.* (2000) 81 Cal.App.4th 1082, 1088 [97 Cal.Rptr.2d 374].) "Equitable contribution, on the other hand, applies to apportion costs among insurers that share the same level of liability on the same risk as to the same insured. [Citation.]" (*Id.* at p. 1089.)

## C. *Rossmoor and Reliance*

 Travelers focuses, as did the trial court, upon the insurance policies and the virtually identical language of the "other insurance" clauses. It argues that because both insurers insured the same risk at the same level, it has the right to equitable contribution from American Equity under the general rule.

Not surprisingly, American Equity focuses upon the indemnity clause of the property management agreement, arguing that it was entitled to subrogation to Preferred Capital's asserted right to indemnity from the receiver. American Equity argues that because it is entitled to subrogation under the express indemnity clause of the property management agreement, its coverage is considered to be "excess" to that provided under the Travelers policy and Travelers has no right to equitable contribution from it.

American Equity relies upon the California Supreme Court opinion in *Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622 [119 Cal.Rptr. 449, 532 P.2d 97] (hereafter *Rossmoor*) to support its analysis. Travelers seeks to distinguish *Rossmoor* and argues that *Reliance, supra,* 72 Cal.App.4th 1063, provides the appropriate template for analysis of the issue. Neither case is on all fours with the present case. However, they provide a starting place.

In *Rossmoor, supra,* 13 Cal.3d 622, the California Supreme Court addressed the rights and obligations of parties to an indemnity agreement. A sewage facility contractor had entered into an agreement with the owner of real property, wherein the contractor agreed to indemnify and hold the owner harmless for all claims for property damage or personal injury. (*Id.* at pp. 625-626.) The owner was held liable for the personal injuries and death of employees from a cave-in of an unshored trench. The owner and its insurer sought indemnity from the contractor and its liability insurer. (*Id.* at p. 627.) The contractor's insurer cross-complained against the owner's insurer seeking apportionment of sums paid under the "other insurance" clauses of the policies. (*Ibid.*) In a court trial, the trial court found the general contractor

(indemnitor) was negligent and the owner (indemnitee) was not actively negligent and therefore required the contractor to indemnify the owner under the terms of the parties' indemnification agreement. The Supreme Court affirmed. (*Id.* at p. 633.)

The Supreme Court also held that the owner's insurance coverage, provided by a direct insurer, was excess over coverage provided by an additional-insured provision in the contractor's policy. (*Rossmoor, supra,* 13 Cal.3d at pp. 633-635.) The "other insurance" clauses of each policy were identical, each stating that if the insured had other insurance against a covered loss, an apportionment would be made. (*Id.* at p. 626.) In denying apportionment between the insurers, the Supreme Court reasoned that the owner's insurance company was subrogated to its insured's right to indemnity from the contractor and its insurer. These subrogation rights extended to sums paid in satisfaction of the tort judgment against the owner. The Supreme Court viewed "one factor as compelling": "[T]o apportion the loss in this case pursuant to the other insurance clauses would effectively negate the indemnity agreement and impose liability on [the owner's insurer] when [the owner] bargained with [the contractor] to avoid that very result as part of the consideration for the construction agreement. We therefore conclude that the rights of indemnity and subrogation must control, and are persuaded the trial court was correct in finding that because the [contractor's insurance policy naming the owner as an additional insured] was part of the consideration for the construction job, it must be viewed as primary insurance under the facts of this case and that [the owner's direct insurer] was subrogated to the rights of [the owner]." (*Id.* at pp. 634-635.)

However, as recognized in subsequent cases, the Supreme Court "did not hold an indemnitee's policy will always be excess. The court instead made it clear it was reaching its conclusion based on the particular circumstances of the case. ([*Rossmoor, supra,* 13 Cal.3d] at p. 634.) The court said that the 'one factor' it found 'compelling' was that the parties had specifically bargained for the contractor to bear the entire costs resulting from its negligent conduct and for the owner to be relieved of any liability where it was not actively negligent. (*Ibid.*)" (*Maryland Casualty Co. v. Nationwide Mutual Ins. Co., supra,* 81 Cal.App.4th at p. 1092; accord, *Reliance, supra,* 72 Cal.App.4th at p. 1081.) As the Court of Appeal in *Reliance* observed, "the Supreme Court's decision in *Rossmoor* did not establish that in all cases where a contract for indemnification exists an insurer is entitled to bring a subrogation action on the agreement. No doubt, *Rossmoor* concluded the owner's insurer in the case before it was subrogated to the rights of its insured under the indemnification contract. However, *Rossmoor* did not

purport to establish a general rule that a contractual indemnification agreement between an insured and a third party takes precedence over well-established general rules of primary and excess coverage in an action between insurers repeatedly articulated by California appellate courts." (*Reliance, supra,* at p. 1081.)

Accordingly, the courts will assess whether the factual circumstances "create[] a relationship between the indemnity contract and the insurance allocation issues . . . ." (*Maryland Casualty Co. v. Nationwide Mutual Ins. Co., supra,* 81 Cal.App.4th at p. 1092.)

In *Reliance, supra,* 72 Cal.App.4th 1063, a primary insurer (Reliance) sued an excess insurer (General Star) for indemnity and contribution, seeking to recover the full amount it had expended in defending and settling an underlying lawsuit involving the two insureds, Don Law and Lollapalooza. The insureds, who were not parties to the action between the insurers, had entered a written agreement wherein Lollapalooza agreed to sponsor a music festival and Don Law agreed to indemnify and hold Lollapalooza harmless for personal injury loss, damage or expense in connection with the festival. (*Id.* at p. 1068-1069.) The contract required Don Law to purchase insurance naming Lollapalooza as an additional insured. (*Ibid.*) General Star insured Don Law under an excess policy and Lollapalooza was named an additional insured under that excess policy as required by the written contract. Lollapalooza was also insured directly by Reliance with both a primary general liability policy with limits of $1 million and under an excess policy providing coverage once the $1 million was exhausted. An audience member was injured at the festival and sued both Don Law and Lollapalooza. All insurers contributed to settlement of the underlying action, Reliance providing a defense to Lollapalooza and contributing $1 million to the settlement on behalf of its insured. Reliance also paid $71,429 under its excess policy. (*Id.* at p. 1071.) General Star contributed $71,429 under its excess policy. Reliance and General Star filed cross actions for declaratory relief regarding their respective duties to defend and indemnify the plaintiff in the underlying action. (*Ibid.*)

The trial court granted summary judgment in favor of General Star, ruling that its duty to indemnify the plaintiff in the underlying action did not arise until after the primary policies of Reliance and another insurer had been exhausted. (*Reliance, supra,* 72 Cal.App.4th at p. 1071.) The Court of Appeal affirmed, concluding that *Rossmoor* was not controlling, as *Reliance* involved a coverage dispute between primary and excess insurance carriers. (*Id.* at p. 1068.) The Court of Appeal in *Reliance* first looked to the insurance

policies and, applying standard rules of interpretation, concluded by their terms that Reliance's coverage of Lollapalooza under its general policy was primary and that General Star's coverage was excess. The appellate court observed that General Star's policy also specifically provided that "Nothing here shall be construed to make this Policy subject to the terms, conditions, and limitations of other insurance, reinsurance or indemnity." (*Id.* at p. 1075.)

The appellate court rejected Reliance's argument that the indemnity agreement controlled. The court first relied upon settled California law that an excess policy does not cover a loss until all of the primary insurance has been exhausted and that an "other insurance" clause dispute cannot arise between excess and primary carriers as they are not "on the same level." (*Reliance, supra,* 72 Cal.App.4th at p. 1077.) The court reviewed the concepts of subrogation and contribution, pointing out that as a general rule, there is no contribution between primary and excess carriers. (*Id.* at pp. 1077-1078.)

The *Reliance* court distinguished *Rossmoor* as an *action between insureds* on an indemnity contract in which apportionment of loss between two primary carriers was raised in a cross-action and in which the owner had sued the contractor's insurer. (*Reliance, supra,* 72 Cal.App.4th at pp. 1079-1080.) It also observed that in equitable contribution cases, the courts generally enforce primary and excess provisions in insurance contracts so long as policyholder rights are not adversely affected. (*Id.* at p. 1080.) The court emphasized several points in resolving the issue: first, the general rule in equitable contribution cases that there is no contribution between primary and excess carriers without a specific agreement to the contrary; and there was no right of contribution established, as Reliance and General Star did not share the same level of coverage where Reliance was primary and Golden Star was excess, "a materially distinguishing characteristic" between *Reliance* and *Rossmoor*. (*Id.* at pp. 1080-1081.) Second, "*Rossmoor* did not purport to establish a general rule that a contractual indemnification agreement between an insured and a third party takes precedence over well-established general rules of primary and excess coverage in an action between insurers," particularly where the policy specifically stated it was not subject to terms, conditions, or limitations of other insurance or indemnity. (*Id.* at p. 1081.) Third, the appellate court recognized a division of authority on whether an insurer is entitled to subrogation against a party who by separate contract has agreed to assume responsibility for the same loss, but is not responsible for causing the loss. The court observed the test for subrogation " 'involves a consideration of, and must necessarily depend upon the

respective equities of the parties.' " The court concluded that on the undisputed facts, the equities did not permit recovery by Reliance. (*Id.* at pp. 1081-1082.)

The circumstances weighing against recovery by Reliance included: that the parties to the indemnity agreement were not present in the action, which was between primary and excess carriers as identified by their policies; the risks involved in primary coverage are different from those involved in issuing an excess policy and these differences were reflected in the premium costs. Finally, the court observed that to accept the arguments of Reliance would be to alter the basic rules construing primary and excess policies. "A primary insurer would be allowed to charge a higher premium for insuring a greater risk; however, then the primary insurer would be allowed to shift the loss to an excess carrier which charged a lower premium. This is not a case between two primary carriers which have each received premiums for bearing the loss which ultimately occurred; rather, this is an action between an excess and a primary carrier. While the loss at issue must be borne by Reliance, it is nothing more than what is bargained for, particularly given the absence of any evidence that it calculated its premium with an understanding that an indemnity agreement would exist between its insured and Don Law. Under the circumstances, *Rossmoor*, a case involving a subrogation and indemnity dispute between two primary carriers and their insured is not controlling in the present case." (*Reliance, supra,* 72 Cal.App.4th at pp. 1082-1083.)

### D. *Application to the Facts in This Case*

Neither *Rossmoor* nor *Reliance* is directly on point. *Reliance* is most easily distinguishable on the basis that it involved insurance coverages at different levels: a true primary policy and a true excess policy. A leading treatise in this area has distilled from *Reliance* the rule that: "A primary insurer is generally *not* entitled to indemnification from a third party's *excess* insurer: 'The risks involved in providing primary coverage are different from when an insurer issues an excess policy . . . reflected in part by the premium costs.' [Citation.]" (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 9:69.1, p. 9-20.) In the instant case, as in *Reliance,* the dispute is between the two insurers rather than the insureds. However, unlike *Reliance,* this case does not involve insurance coverage at different levels, or different risks reflected in premium costs. Nor does the Travelers policy expressly state it cannot be modified or altered by any other insurance or indemnity agreement.

*Rossmoor* is distinguishable as an action primarily between two insureds on a contract for indemnity between the two. The owner, through its

insurance carrier, had satisfied the tort judgment against it and had paid the costs associated with that litigation. The owner sued the indemnitor-contractor and the contractor's insurer as well. The contractor's insurer cross-complained against the owner's insurer. The appellate court first held that as between the owner and the contractor, the owner was entitled to indemnity under the general indemnity clause of their agreement because the owner was not actively negligent in the underlying tort. (*Rossmoor, supra,* 13 Cal.3d at pp. 629-633.) The owner's insurer was properly subrogated to the owner's right of indemnification, since it had paid the judgment and since the owner had a right of indemnity against the contractor. (*Id.* at pp. 633-634.) Once the owner's liability to the victims was shifted entirely to the contractor, as between the respective insurers there remained no "other insurance" issue in the case, as the coverage under the contractor's policy must first be exhausted before going to the owner's coverage. (*Id.* at pp. 634-635.)

Here, the action is between two insurers, both of whom have issued contracts of insurance covering the same insured, Preferred Capital. Thus, the case looks more like the typical dispute between insurance carriers, which should be governed by general principles governing the interpretation and enforcement of "other insurance" clauses between insurers.

More importantly, subrogation of the insurer to the rights of the insured presupposes the insured, Preferred Capital, has a right to indemnity from the receiver or from Lakeview under the indemnity agreement. This determination was never made below and those parties (the receiver, Lakeview and Preferred Capital) are not parties to this action. Were Preferred Capital to seek indemnity directly from the receiver or from Lakeview under the agreement, it might be shown that Preferred Capital was not entitled to indemnity on the grounds that it was actively or intentionally negligent in causing the victim's injury. To require Travelers to prove that its own insured (Preferred Capital as an additional insured under the policy) was actively or intentionally negligent in order to succeed in recovering equitable contribution from American Equity would be bad public policy and clearly inconsistent with equitable considerations.

Moreover, unlike the owner-indemnitee's insurer in *Rossmoor*, American Equity has paid nothing toward the defense or settlement of the underlying action. It is generally the case that in order to state a cause of action for equitable subrogation, the insurer must establish that "the insurer, in whole or in part, has compensated the insured for the same loss for which the party to be charged is liable." (*Patent Scaffolding Co. v. William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 509 [64 Cal.Rptr. 187]; Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 9:41, p. 9-11.)

In determining whether the contractual right to indemnification between parties to insurance contracts should control over the terms of the insurance contracts requiring proration, the Supreme Court in *Rossmoor* found certain equitable considerations controlling: that both companies accepted premiums with knowledge they might be called upon to satisfy a full judgment, and that to apportion the loss pursuant to "other insurance" clauses would "effectively negate the indemnity agreement" and impose liability upon the owner's insurer when the owner bargained with the contractor to avoid that result as part of the consideration for the construction agreement. (*Rossmoor, supra,* 13 Cal.3d at p. 634.) Here, too, both insurers were prepared to satisfy a full judgment, although both also agreed to apportion loss in case of other insurance at the same level. However, because it has not been established and we cannot say with certainty under the circumstances that Preferred Capital is entitled to indemnity from the receiver or Lakeview under the property management agreement, we never reach the equitable consideration that *Rossmoor* found controlling. Indeed, in these circumstances, the equitable considerations favor apportionment. Concern that the indemnity agreement between Preferred Capital and the receiver would be negated by prorating the loss presupposes the determination that the receiver would be liable to indemnify Preferred Capital under that agreement. That determination has never been made.[2]

## CONCLUSION

In the circumstances of this case, we conclude the trial court properly determined Travelers was entitled to equitable contribution from American Equity based upon established principles guiding the interpretation of conflicting "other insurance" clauses and also properly determined that equitable considerations did not take this case outside of the general rule. The trial court did not abuse its discretion in granting summary judgment for Travelers and in denying summary judgment for American Equity.

The judgment is affirmed. Travelers shall recover its costs on appeal.

Lambden, J., and Ruvolo, J., concurred.

---

[2]We need not determine the merit of additional arguments mounted by Travelers in support of its contention that American Equity is not entitled to shift the entire loss to Travelers.